UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------X
UNITED STATES OF AMERICA,      :

     -against-              :

VICTOR LORENZANO,              :

              Defendant.    :
----------------------------X

                          S9 03 Cr. 1256 (JFK)

                          OPINION and ORDER

APPEARANCES:


          For the United States of America:
            MICHAEL J. GARCIA
            United States Attorney for the
            Southern District of New York
            New York, New York
            Of Counsel: Joshua A. Goldberg
                       Assistant United
                       States Attorney


          For the Defendant:
            Aubrey Lees
            New York, New York


**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

**Background**

Defendant Victor Lorenzano moves for:

(i)  a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure; and

(ii) a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Lorenzano was charged by indictment with a total of ten counts.  Count One charged him with participating in a conspiracy from at least in or about 1995 through in or about 2001 to commit armed robberies and attempted armed robberies of persons engaged in narcotics trafficking and/or commercial activities that affected interstate commerce, in violation of 18 U.S.C. § 1951.  Counts Two, Three, and Five each charged particular Hobbs Act robberies, in violation of 18 U.S.C. §§ 1951 and 2.  Counts Six, Seven, and Nine each charged him with using, carrying and brandishing a firearm during and in relation to particular robberies, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.  Count Ten charged Lorenzano with participating in a conspiracy from at least in or about 1995 through in or about late 2001 to distribute and possess with intent to distribute five kilograms and more of cocaine and one kilogram and more of heroin, in violation of 21

U.S.C. §§ 846, 812, 841(a)(1), and 841(b)(1)(A).
Counts Eleven and Twelve each charged Lorenzano with
money laundering, in violation of 18 U.S.C. §§ 1956(a)
(1)(B)(i) and 2.

Trial against Lorenzano and a co-defendant
Ramon Reyes began on June 1, 2005.  On June 29, 2005,
the jury convicted Lorenzano of all counts, except for
Count Twelve, the second money laundering count.  The
co-defendant Ramon Reyes was acquitted by the jury.

## THE EVIDENCE AT TRIAL

The evidence against Lorenzano was
overwhelming.  It established that he was a long-time
member of a vicious and violent armed robbery crew that
targeted mainly drug dealers.  From 1995 through 2001,
the crew committed dozens of armed robberies in New
York City.  They stole cocaine and heroin worth
millions of dollars using violence, intimidation, and
torture to accomplish their ends.

Lorenzano was a main member of the crew and
one its most dangerous members.  During robberies,
Lorenzano brandished loaded firearms, "locked down"
victims, searched apartments, and pistol-whipped
victims.  When one victim was unwilling to disclose the
whereabouts of a drug stash, he stabbed the victim in

the leg with a large knife, causing the victim to bleed heavily.  An accomplice had to fashion a tourniquet to stem the bleeding.

The evidence showed that Lorenzano participated in many robberies, attempted robberies, and burglaries.  Four were specifically set forth in the indictment.

They were:

(1)   The May 7, 1996 burglary of a narcotics stash apartment in the vicinity of 170th Street and Audubon Avenue in Manhattan. Lorenzano was a lookout for the burglary.  Three accomplices were arrested during this burglary.

(2)   The October 30, 1998 armed robbery at a bakery wholesaler on East 180th Street in the Bronx.  Lorenzano displayed a gun and stood guard over bakery workers during the robbery.  He threatened to kill them if they tried to set off an alarm.

(3)   The March 14, 2000 armed robbery in the Crystal House apartment building, located at Matthews and Lydig Avenues in the Bronx.  This was the robbery in which Lorenzano stabbed a victim in the thigh with a large knife. (supra).

(4)   The May 18, 2000 armed robbery of passengers inside a livery cab near 228th Street and Kingsbridge Avenue in the Bronx.  Lorenzano and his accomplices stole over 30 kilograms of cocaine during this robbery.  They then stole the cab and set it on fire.

There was also evidence of a fifth charged robbery in which the crew stole 40 kilograms of cocaine in or about early 2000 from individuals in an apartment at 177th Street and Amsterdam Avenue in Manhattan. Lorenzano was to participate in this robbery, but he arrived late. However, he received a share of the robbery proceeds.

The Government called twenty-three witnesses at trial. Five were long-time associates of Lorenzano who each participated in several robberies with him. There were also victims of Lorenzano's robberies, law enforcement officers who responded to robberies and collected crime scene evidence, an NYPD detective who took part in court-ordered searches of accomplices' residences and vehicles, and an ATF Special Agent who conducted surveillance of Lorenzano prior to his arrest. He testified about Lorenzano's post-arrest statements. There was a car dealership representative who provided documents related to a new vehicle that Lorenzano purchased with a large cash payment using robbery proceeds, and a witness who reviewed extensive phone records detailing connections between Lorenzano and his co-conspirators.

The Government also introduced many seized firearms and ammunition, including six firearms that were found at one of Lorenzano's prior residences, tools used during robberies which included radios, walkie-talkies, scanners, cable ties, handcuffs, a bulletproof vest, crowbars, and crime scene photographs.  Evidence of fake identification of Lorenzano and seized notebooks reflecting disbursements of stolen drugs to Lorenzano and others following successful robberies were also introduced.

## DISCUSSION

The Government argument that the motion is untimely is rejected and the Court will address the merits of the various parts of the motion.

There are two separate matters raised by this motion. First, Lorenzano claims that he was deprived of his right to be present during all material stages of his trial when the Court conducted interviews of a juror outside of his presence.  He further claims he was denied effective assistance of counsel because his trial attorney allegedly failed to advise him of what happened during those interviews.  (See Lorenzano Decl. Nov. 9, 2006.)  Second, Lorenzano challenges the Court's jury instructions regarding the interstate

commerce element of the Hobbs Act robbery charges and argues that the Government failed to prove that element beyond a reasonable doubt.

Apparently, the first claim is brought under Rule 33 and the second is under Rule 29 insofar as it relates to the sufficiency of the evidence.

It is Hornbook law that in considering a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the Court must view the evidence "in the light most favorable to the government." United States v. Zagari, 111 F.3d 307, 327 (2d Cir. 1997); accord United States v. Torres, 901 F.2d 205, 216 (2d Cir. 1990). "'All reasonable inferences are to be resolved in favor of the prosecution.'" United States v. Rodriguez, 702 F.2d 38, 41 (2d Cir. 1983) (quoting United States v. Artuso, 618 F.2d 192, 195 (2d Cir. 1980)). "The verdict will be sustained unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Zagari, 111 F.3d at 327 (internal quotation omitted).

Rule 33 of the Federal Rules of Criminal Procedure "authorizes a district court to grant a new trial 'if required in the interest of justice.'" United States v. Locascio, 6 F.3d 924, 949 (2d Cir.

1993) (quoting Fed. R. Crim. P. 33).  "[M]otions for a new trial are disfavored in this Circuit," <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995), and should not be granted unless, after evaluating all of the evidence, the district court is left with a "real concern that an innocent person may have been convicted." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992); <u>accord</u> <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001).  There is no such concern here.

Rule 33 requires the Court to examine the entire record of the trial in determining whether the verdict was a manifest injustice.  <u>See</u> <u>Ferguson</u>, 246 F.3d at 134 ("The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation").  The rule permits the granting of the extraordinary relief of a new trial only when "letting a guilty verdict stand would be a manifest injustice." <u>Id</u>. (citing <u>Sanchez</u>, 969 F.2d at 1414).

The defendant bears the burden of demonstrating that a new trial is warranted.  <u>United States v. Sasso</u>, 59 F.3d 341, 350 (2d Cir. 1995).  He has not met that burden.

-8-

## I. LORENZANO WAS NOT DEPRIVED OF THE RIGHT TO BE PRESENT AT ALL MATERIAL STAGES OF HIS TRIAL

Lorenzano argues that the Court conducted interviews of a juror outside of his presence.  This took place first during jury selection and then prior to deliberations.  Lorenzano claims that had he been present during these interviews, he would have objected to allowing the juror to serve and then moved to excuse him prior to deliberations.  The claims are without merit.  Lorenzano was present during all material stages of his trial, including jury selection.  To the extent he was not present during some of the interviews of a particular juror, he waived his right to be present.  If he should have been present during such interviews, any error was harmless.

### A. Interview During Jury Selection

Jury selection took place on June 1 and June 2, 2005.  The Court asked prospective jurors whether the expected length of the trial would cause any of them serious hardship.  (V.D. 8.)[1]  Jurors who raised their hands in response to this question were asked to come to sidebar.  Counsel for the defendants and the Government were present at sidebar, but the

---

[1] "V.D." refers to the page of the minutes during voir dire examination of jurors.

defendants were not.  Neither defendant nor their
counsel objected to the method of jury selection or the
fact that jurors were invited to the sidebar to answer
certain questions without the defendant being present.

Relating to the inquiry about hardship
because of the length of the trial, Juror Number 22,
Vincent Guzman, answered that he was starting a new job
in "about two weeks" as a state "police" officer in the
New York State Office of Mental Health and that he was
concerned that serving on the jury might interfere
with his new job.  (V.D. 42.)  The Court assured Guzman
that the Court would write a letter to Mr. Guzman's
superior and tell him that Guzman could not be excused.
Mr. Guzman replied, "Okay" and was not excused. (V.D.
42.)

Further information about the case was given
to the jurors and they were asked more questions about
their ability to serve.  Parts of this section of jury
selection were also held at sidebar, without objection.
In answer to a question about whether any prospective
juror had any close friends or relatives in law
enforcement, Guzman said in open court that his brother
was a correctional officer for New York State
corrections at Sing Sing.  (V.D. 69.)  The Court later

-10-

asked Mr. Guzman, again in open court, "we know you
are about to take a job with the state.  What is
your educational background?"  Mr. Guzman then
explained that he had an "associate's in business
administration."  (V.D. 107.)  Mr. Guzman then provided
additional information about himself, including where
he lived and his marital status.

Later in the voir dire, the Court inquired if
any jurors had ever been arrested or convicted of a
crime.  Mr. Guzman approached the sidebar and said that
he had once been charged with criminal mischief as a
result of an altercation arising from an earlier job as
a security officer.  (V.D. 114.)  He made clear that
this would not affect his ability to serve.

After the parties exercised their peremptory
challenges, Mr. Guzman was not challenged and was then
empaneled as Juror Number 10.

### B. Interview Before Jury Deliberations

Summations were heard on June 27, 2005.
After the arguments, the Court gave the first half of
its jury instructions before breaking for the day.
(Tr. 2104.)[2]  On the morning of June 28, 2005, the
Court advised the parties that on the evening of

---

[2]  "Tr." refers to the page of the Trial Transcript.

June 27, 2005, the Court had received a message from a juror who said that another juror - Mr. Guzman - had made a comment about an outburst by Lorenzano that occurred during the Government's summation.  (Tr. 2107-08.)  In response to this message, the Court conducted an inquiry in the robing room with the attorneys for both defendants and the Government present.  Defendants were not present during this inquiry.  No objection was voiced to this procedure.

The Court first interviewed the juror who had reported the alleged comment by Mr. Guzman.  According to this juror, during a break after Lorenzano's outburst, Mr. Guzman was standing with another juror and said something to the effect of "'He must be' - something - 'because he got so defensive.'" The juror said that he could not remember "what he said though." (Tr. 2109.)

The Court next spoke to Mr. Guzman, who said that he remembered Lorenzano's outburst, but that he did not make any comments to any other jurors about the outburst. (Tr. 2111-12.)  Mr. Guzman said that he was "definitely" sure that he had not made any comments. (Tr. 2111-12.)

The Court then interviewed the juror to whom Mr. Guzman had allegedly spoken.  This juror also remembered Lorenzano's outburst, but said that neither Mr. Guzman nor anyone else had made any comments about it.  (Tr. 2113-14.)  All three jurors assured the Court that neither Lorenzano's outburst nor whatever had been said about the outburst would have any impact on their ability to be fair and impartial in the case.  (Tr. 2110, 2113, 2115.)

Following the interviews, the Court asked the parties whether anyone had an application.  The Government said that it would not object if Mr. Guzman was removed.  (Tr. 2115.)  After conferring, both defense counsel advised the Court that they wanted to "keep" Mr. Guzman.  Lorenzano's counsel pointed out that both Mr. Guzman and the juror that he had allegedly spoken to were "unequivocal [that] nothing was discussed at all."  (Tr. 2116.)  Defense counsel added that the first juror who reported the alleged conduct may have "misunderstood the context of a comment," and that "the comment may not have been in fact directed at Mr. Lorenzano's statement during [the Government's] summation."  (Tr. 2116.)

The Court agreed to leave Mr. Guzman on the jury. (Tr. 2117-18.) The Court noted that both Mr. Guzman and the juror he allegedly spoke to denied the incident, and that the first juror simply may have been mistaken. In the end, the Court concluded that even if something had been said it did not amount to "anything." (Tr. 2118.) Having decided this issue, the Court returned to open court to complete its jury instructions.

Defendant Lorenzano's trial counsel, Jeremy Schneider, filed an affirmation in connection with this motion. Mr. Schneider is an experienced, able trial lawyer. His affirmation, dated November 16, 2006, states at paragraphs 2, 4 and 5:

> 2. ... Throughout the trial, I discussed all major decisions with Mr. Lorenzano and kept him informed as to developments in the case. Generally speaking, this included information about what occurred at sidebars and in the robing room. At no point during trial did I believe that I was having difficulty communicating with Mr. Lorenzano or that he was dissatisfied with my representation of him.

> 4. I understand that Mr. Lorenzano has raised an issue regarding the fact that Juror Number 10, Vincent Guzman, at one point stated that he was starting a job in law enforcement with the New York State Office of Mental Health. I do not specifically remember if I discussed this fact with Mr. Lorenzano, but I believe that I would have. I also believe that this would have been a factor that I would have considered and discussed with Mr. Lorenzano and co-counsel in deciding whether to try to excuse Mr. Guzman. Although I do not remember the specific

-14-

reasons why the defense decided not to use a peremptory
challenge on Mr. Guzman, I believe that we made a
strategic decision to keep him on the jury.  I do not
remember Mr. Lorenzano ever stating that he wanted to
remove Mr. Guzman from the jury.

     5.  I recall that an issue arose involving
Mr. Guzman prior to jury deliberations, regarding a
comment that Mr. Guzman had allegedly made to another
juror about an outburst by Mr. Lorenzano during the
Government's summation the day before.  I also remember
that the Court conducted an interview of Mr. Guzman and
two other jurors in the robing room to address the
issue.  I do not recall specifically whether I spoke to
Mr. Lorenzano about these interviews after they were
completed, but I believe that I would have spoken to
him based on my standard practice and my positive
relationship with Mr. Lorenzano at the time.  Mr.
De Marco (counsel for the co-defendant) and I agreed
for strategic reasons to object to Mr. Guzman's removal
from the jury.  I do not recall Mr. Lorenzano ever
objecting to Mr. Guzman's continued presence on the
jury.

     Mr. Schneider's affirmation is entirely

credible and the Lorenzano Declaration of November 9,

2006, to the degree it questions Mr. Schneider's

conduct, is without merit.

     Lorenzano's allegation that he did not know

what Mr. Guzman said during the interviews is highly

questionable.  Concerning the statements during jury

selection, it is a real stretch to believe that

Lorenzano did not know about Mr. Guzman's future

employment.  The Court in open court referred to the

fact that Mr. Guzman was "about to take a job with the

state." (V.D. 107.)  Lorenzano had ample time to

-15-

consult with counsel during jury selection, and he participated in all aspects of jury selection, including the exercise of peremptory challenges.  The reasonable inference is that Lorenzano was informed of Mr. Guzman's employment status.  Likewise, it is simply not credible that trial counsel failed to advise Lorenzano about what had happened in the robing room prior to jury deliberations, when Lorenzano had been sitting in the Courtroom during the juror interviews and presumably would have asked defense counsel about the reason for the delay.  This conclusion is clearly in accord with the Schneider affirmation.  Moreover, present defense counsel sought, and the Court, on September 29, 2006 granted, an examination of Lorenzano by a psychiatrist for sentencing purposes.  In his report of October 26, 2006, Dr. Lawrence Segal found that Lorenzano shows "indications of pathological lying" and "being conning and manipulative."

        Counsel does not specifically recall whether he informed Lorenzano about Mr. Guzman's statements, but his general recollection is that he kept Lorenzano informed about developments in the case, including what happened at sidebars and in the robing room. (Schneider Aff. ¶ 2.)  Trial counsel remembers that

Lorenzano was involved in the jury selection process
and that he conferred with Lorenzano regarding
potential jurors and how the defense should use
its peremptory challenges.  (Schneider Aff. ¶ 3.)
Although Mr. Schneider does not specifically recall
discussing Mr. Guzman's job with Lorenzano, he believes
that he would have had such a discussion and that Mr.
Guzman's employment would have been a factor to
consider and discuss with Lorenzano in deciding whether
to try to excuse Mr. Guzman.  (Schneider Aff. ¶ 4.)  In
the end, defense counsel decided to keep Mr. Guzman on
the jury for strategic reasons.  Perhaps Mr. Guzman's
arrest for the altercation with the security officer
entered into the decision.

        Likewise, counsel does not specifically
recall talking to Lorenzano about what happened in the
robing room prior to jury deliberations.  However, he
believes that he would have spoken to Lorenzano about
the issue raised by Mr. Guzman's alleged comments based
on his standard practice and his positive relationship
with Lorenzano at the time.  (Schneider Aff. ¶ 5.)
Defense counsel does not recall Lorenzano ever
objecting to the decision to keep Mr. Guzman (Schneider
Aff. ¶ 5.)

Although defense counsel has no specific recollection of what happened following the interviews of Mr. Guzman, his general recollection coupled with his standard practice and his relationship with Lorenzano supports the clear conclusion that Lorenzano was informed about these interviews.

There is no need for a hearing on this or any other issue.  In any event, Lorenzano has failed to establish a claim of ineffective assistance of counsel.

A claim of ineffective assistance of counsel must: (1) demonstrate that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from counsel's allegedly defective performance.  Strickland v. Washington, 466 U.S. 668, 687-88, 693-94 (1984); see Hernandez v. United States, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the Strickland standard, a petitioner must establish both (1) that counsel made errors so serious that defendant was deprived of reasonably competent representation and (2) that counsel's deficient performance prejudiced the defense").  Both elements must be satisfied for a defendant to show that counsel "was not functioning as the 'counsel'

guaranteed by the Sixth Amendment," and that the
defendant was, as a result, deprived of a fair
proceeding.  Strickland, 466 U.S. at 687.

In Strickland, the Supreme Court held that:

> "Judicial scrutiny of counsel's
> performance must be highly
> deferential.  It is all too
> tempting for a defendant to
> second-guess counsel's
> assistance after conviction
> or adverse sentence, and it is
> all too easy for a court, examining
> counsel's defense after it has
> proved unsuccessful, to conclude
> that a particular act or omission
> of counsel was unreasonable.  A
> fair assessment of attorney
> performance requires that every
> effort be made to eliminate the
> distorting effects of hindsight,
> to reconstruct the circumstances
> of counsel's challenged conduct,
> and to evaluate the conduct from
> counsel's perspective at the time."

Id. at 689 (citations omitted).

To meet the prejudice prong of Strickland, a
defendant must show "a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different."  Id. at 694.  "'A
reasonable probability is a probability sufficient to
undermine confidence in the outcome.'"  Mayo v.
Henderson, 13 F.3d 528, 534 (2d Cir. 1994) (quoting
Strickland, 466 U.S. at 694).  It is not enough to show
merely that counsel's errors had "some conceivable

effect" on the result, for "not every error that
conceivably could have influenced the outcome
undermines the reliability of the result of the
proceeding." Id. at 693.  There is no showing of any
"conceivable effect" on the result here.

Here, Lorenzano has not shown any error by
counsel, and certainly not one that caused him
prejudice.  The fact is that Mr. Guzman ultimately
voted to acquit - with the rest of the jury - on all
counts against Reyes and on one count against
Lorenzano.  This by itself proves that Mr. Guzman
was not predisposed to favor the Government.

Lorenzano's claim that he would have objected
to Mr. Guzman serving on the jury is contradicted by
the fact that at least three other jurors with law
enforcement connections were seated on the jury,
without objection from Lorenzano.  Specifically, Juror
Number 7, Ms. Lopez, stated that her brother was a
sergeant with the NYPD (V.D. 70-71), Juror Number 9,
Ms. Antonaccio, said that she had a brother-in-law who
had been a narcotics detective (V.D. 68-69), and Juror
Number 3, Mr. Jordan, stated that he had a cousin who

was an NYPD police officer (V.D. 72).[3]  Lorenzano did
not object to any of these prospective jurors and there
is no reason to believe that he would have objected to
Mr. Guzman even if his factually questionable claim is
accepted.

   Lorenzano's claim of ineffective assistance
of counsel fails.  The motion under Rule 33 is denied
in all respects.

### II. THE COURT'S INSTRUCTIONS ON HOBBS ACT ROBBERY INTERSTATE COMMERCE

   Lorenzano also challenges the Court's
instructions on the interstate commerce element of
Hobbs Act robbery.

   In its charge, the Court instructed the jury
that to convict Lorenzano of Hobbs Act robbery, the
Government had to prove beyond a reasonable doubt that
the defendant's "actions actually or potentially in any
way or degree obstructed, delayed, or affected
interstate commerce."  (Tr. 2097.)  The Court explained
this element as follows:

>    The third element that the
> government must prove is that a
> robbery affected interstate or
> foreign commerce or, with respect

---

[3]  In open Court, Mr. Guzman also told the Court that
his brother worked as a New York State correctional
Officer.  (V.D. 69.)

to an attempted robbery, that
interstate or foreign commerce
would have been or potentially
would have been affected in some
way, even if the effect would have
been slight or minor.

The requirement of showing an
effect on interstate commerce involves
only a minimal burden of proving a
connection to interstate commerce,
and it is satisfied by conduct that
affects commerce in any way or degree.
This requirement may be satisfied by a
showing of a very slight effect on
interstate commerce.  Even a potential
or subtle effect on commerce will
suffice.  It is not necessary for the
government to prove that commerce was
affected by a defendant's conduct.  It
is sufficient if the alleged robbery
possibly or potentially would have
affected interstate or foreign commerce.

It is not necessary for you to
find that the defendant intended or
anticipated that the effect of his own acts
or the acts of his co-conspirators would be
to affect interstate commerce or that the
defendant or his co-conspirators had or
shared a purpose that would affect commerce.
All that is necessary is that the natural
effect of the acts he conspired to commit
would either actually or potentially affect
interstate or foreign commerce.

Nor do you have to decide whether the
effect on interstate commerce was or would
have been harmful or beneficial to a
particular business or commerce in general.
The government satisfies its burden of
proving an effect on commerce if it proves
beyond a reasonable doubt any effect, whether
harmful or not.

If you find beyond a reasonable doubt
that the target of a robbery purchased or
sold items that flowed in interstate commerce

-22-

and that the money that the defendant
conspired to take belonged to the target,
then this element will have been met.
Moreover, if you find that the defendant you
are considering believed that the target of
the robbery purchased or sold items that
flowed in interstate commerce, then this
item will be satisfied even if the
defendant's belief ultimately proved
incorrect.  In other words, even if the
target of a robbery was not in fact engaged
in interstate commerce, this element will
be satisfied if at the time of the robbery
the defendant intended to commit a robbery
that would have or potentially could have
affected interstate commerce.

When considering this element, it is
important for you to know that commerce
affected or potentially affected need not be
lawful.  Activities affecting or potentially
affecting unlawful interstate activity, such
as drug dealing and trafficking, fall within
the purview of the statute.  Indeed, the
United States Congress has determined that
all illegal drug dealing, even when purely
local in nature, has a substantial effect on
interstate commerce.  Thus, if you find that
the object of the robbery was to obtain
illegal drugs or money earned from the sale
of drugs, you may find this element
satisfied.

(Tr. 201-03 (emphasis added.))

Lorenzano argues that the portion of the

charge underlined was clearly erroneous because it, in

effect, "was a directed verdict on a critical finding

that a jury must determine."  Lorenzano relies on

United States v. Gomez, No. 99 Cr. 740, 2005 WL 152970

(S.D.N.Y. June 28, 2005), a ruling by Judge McKenna.

-23-

In <u>Gomez</u>, Judge McKenna found the instruction improper because it "'removed from the jury at least a portion of the jurisdictional element.'" <u>Id.</u> at *11 (quoting <u>United States v. Vasquez</u>, 267 F.3d 79, 88 (2d Cir. 2001)).  In reaching this conclusion, however, Judge McKenna did not recognize that the Second Circuit specifically upheld the challenged instruction in <u>United States v. Fabian</u>, 312 F.3d 550, 558 (2d Cir. 2002) (quoting instruction and holding that "the jury instruction was proper").  More recently, Judge Lynch expressly rejected the decision in <u>Gomez</u> and upheld the propriety of the challenged instruction.  <u>See</u> <u>United States v. Robles</u>, No. 04 Cr. 1036, 2006 WL 988249, at *1 (S.D.N.Y. Apr. 13, 2006).  I agree with Judge Lynch.

The claim that the Government failed to "present any evidence to prove that the robberies had any connection to interstate commerce" (Lorenzano Br. 5) is overcome by the evidence, the testimony and documents presented at trial.

The Government proved that the defendant's targeted narcotics dealers - an industry that by definition affects interstate commerce, <u>see</u>, <u>e.g.</u>, <u>Fabian</u>, 312 F.3d at 555.  Further, there was specific proof establishing the interstate commerce element with

regard to the robbery of the bakery on October 30, 1998.  The Government presented proof that the bakery shipped products to 48 states (Tr. 955), and received materials from wholesales and distributors, including companies located outside New York State (Tr. 958). The owner of the bakery explained that the bakery shipped goods as far away as Texas and California. (Tr. 959.)  Invoices further showed that the bakery's business affected interstate commerce through transactions with suppliers and customers in out-of-state locations such as New Jersey, Florida, and Maryland.  (Tr. 960-61; Gov't Ex. 182).

The Government also presented proof of an effect on interstate commerce from the drug robberies. For example, for the March 14, 2000 robbery at Crystal House in the Bronx, the Government presented proof that the victims of the robbery sold drugs not just in New York, but also in New Jersey.  (Tr. 1224.)

There was more than sufficient evidence to establish an effect on interstate commerce.  See United States v. Wilkerson, 361 F.3d 717, 730 (2d Cir. 2004), United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002), United States v. Jamison, 299 F.3d 114, 121 (2d Cir. 2002).

-25-

On December 8, 2006, defense counsel raised an additional issue relating to this motion. The communication was received on December 12, 2006 and responded to by the Government. In this addendum, Lorenzano argues that under Crawford v. Washington, 541 U.S. 36 (2004), his Sixth Amendment rights were violated because Wilfredo Perez Geneo, the man stabbed in the leg in the Crystal House robbery of March 14, 2000, was not called as a witness. See supra p. 4. This argument is meritless. No statements by Geneo were introduced at trial and Crawford does not require the Government to call any particular witness. Crawford applies to testimonial statements received for the truth of the matter asserted. Nothing like that occurred here.

Lorenzano's motion for a judgment of acquittal, pursuant to Rule 29, or a new trial, pursuant to Rule 33, is denied in its entirety.

Sentence is set for January 16, 2007 at 10:15 a.m. There will be no adjournments of sentence.

**SO ORDERED.**

Dated: New York, New York
       January 3, 2007

JOHN F. KEENAN
United States District Judge